FILED
2024 May-31  PM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **STEVEN CORNELISON,** *Individually and For Others Similarly Situated*, | } } } } |
| **Plaintiff,** | } } |
| **v.** | } **Case No.: 5:20-cv-01157-MHH** } |
| **SOUTHERN SYNERGY, INC.,** | } } } |
| **Defendant.** | } |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this Fair Labor Standards Act collective action, Mr. Cornelison has asked the Court to sanction Southern Synergy because Southern Synergy improperly communicated with its employees about Mr. Cornelison's FLSA lawsuit and the company's obligations to its employees under the FLSA. Mr. Cornelison asserts that, through written and oral communications, Southern Synergy dissuaded its employees from responding to court-authorized notices advising the employees of their opportunity to join Mr. Cornelison's lawsuit to recover unpaid overtime wages and liquidated damages. (Doc. 74). Mr. Cornelison contends that through its bad faith conduct, Southern Synergy avoided payment of more than $350,000 in liquidated damages. (Doc. 74, p. 11). To penalize Southern Synergy for its conduct,

Mr. Cornelison asks the Court to order Southern Synergy to pay its employees $350,000 in liquidated damages and to pay Mr. Cornelison's attorneys' fees and costs for their efforts in this litigation. (Doc. 74, p. 14).

The Court previously has addressed Southern Synergy's improper behavior in this case. For context, the Court repeats those findings, supplements the findings based on recent events, and then discusses the sanction that it will impose and the steps it will take to conclude this action.

## I.

Mr. Cornelison filed his complaint in this collective action on August 11, 2020. (Doc. 1). In his complaint, Mr. Cornelison alleges that Southern Synergy violated the FLSA because Southern Synergy did not pay him an overtime wage when he worked more than 40 hours in a calendar week. (Doc. 1). Mr. Cornelison, who was a Senior Technical Specialist for Southern Synergy, alleges that Southern Synergy paid him and co-workers like him "straight time, with no overtime pay, no matter how many hours they worked," and they "worked in excess of 40 hours each week." (Doc. 1, ¶¶ 5, 50; *see also* Doc. 1, ¶¶ 18, 31, 43, 48, 49, 51).[1] Mr. Cornelison alleges that Southern Synergy knew that he and his similarly situated co-workers "worked more than 40 hours in a week on multiple

---

[1] Mr. Cornelison left Southern Synergy on December 31, 2019. (Doc. 1, ¶¶ 2, 13, 34; Doc. 11, p. 3; Doc. 30, p. 3).

occasions" and "knew, or showed reckless regard for whether, Cornelison and the Putative Class Members were not exempt from the FLSA's overtime provisions." (Doc. 1, ¶¶ 55–56).  Mr. Cornelison contends that Southern Synergy intentionally and willfully engaged in a pattern of violating the FLSA by not properly compensating him and his similarly situated co-workers.  (Doc. 1, ¶ 85). Mr. Cornelison seeks overtime compensation and liquidated damages for himself and for similarly situated Southern Synergy employees, and he seeks an award of attorney fees and costs.  (Doc. 1, ¶ 104).

In his complaint, Mr. Cornelison asked the Court to provide notice of his collective action to Southern Synergy employees who met the following description:

> All hourly workers employed by, or working on behalf of, Defendant Southern Synergy, Inc. who worked in excess of 40 hours per week and were denied or not paid overtime compensation any time during the past three (3) years.

(Doc. 1, ¶ 19).  Mr. Cornelison alleged that Southern Synergy workers who qualified to opt-in to this collective action were known to Southern Synergy and readily identifiable through the company's records.  (Doc. 1, ¶ 90).

History shows that Mr. Cornelison's allegations were correct.  Southern Synergy received service of Mr. Cornelison's complaint on August 20, 2020. (Doc. 4).  Soon after, the company "reviewed its time and pay records" and "paid all

employees one-half of each employee's regular rate of pay for all hours worked over 40 in each workweek during the preceding three-year period." (Doc. 30-1, ¶ 3). In a letter dated September 9, 2020, the company acknowledged that it had not paid its employees correctly under the FLSA and reported that the company mistakenly believed that the employees were "considered Exempt under the FLSA." (Doc. 38-1). Southern Synergy apologized and stated:

> [T]o make that up to you all, we have reviewed the timesheets and payrolls for the last 3 years (the max statute of limitation under FLSA) to determine which employees are entitled to "unpaid wages". To determine the "unpaid wages" that we owe you, we went back to each workweek in which you worked more than 40 hours (vacations and Holiday hours don't count). Since we have always paid straight time for all work hours, we are now paying for the "half time" that you did not receive.
>
> This week, we have processed a payment for the "unpaid wages". You will find the paycheck and paystub for those unpaid wages. You will also find a separate check for interest on the "unpaid wages" in the amount of 4.5% of the "unpaid wages".
>
> If you have any questions about your payments, please contact Jennifer.

(Doc. 38-1). Southern Synergy made the overtime wage payments either by check or direct deposit, and every employee other than Mr. Cornelison who received a check for unpaid wages deposited the check, and the check "cleared the bank." (Doc. 30-1, p. 2). Southern Synergy did not include in the letter to its employees an explanation of the employees' rights under the FLSA or information about

Mr. Cornelison's pending collective action and his request for liquidated damages for himself and all of them.

On September 10, 2020, Southern Synergy filed a "Verified Answer" to Mr. Cornelison's complaint. (Doc. 11). In the answer, Southern Synergy stated that it "employed Cornelison on what it believed to be a salary basis, with additional compensation to be paid on an hourly basis if Cornelison worked more than 40 hours in an FLSA workweek." (Doc. 11, p. 2). Southern Synergy admitted that, regardless of its purported belief, "[i]n practice, [it] did not pay Cornelison on a salary basis but paid him on a biweekly basis at a fixed hourly rate for each hour that he worked in each FLSA workweek" but "failed to pay Cornelison the FLSA overtime premium of ½ his regular rate of pay for each hour of productive work over 40 hours performed in each FLSA workweek for the three-year period immediately preceding the filing of Cornelison's Complaint." (Doc. 11, p. 2).[2] Southern Synergy asserted that after Mr. Cornelison filed his complaint, the company "learned that Cornelison was not exempt from the FLSA's overtime provision because he was paid on an

_____

[2] Southern Synergy attached a copy of Mr. Cornelison's offer letter to its opposition to Mr. Cornelison's motion for conditional class certification. The compensation provision in the letter states:

> **Base Pay Rate:** $35.00/hr ($72,800/yr based on 2080 hours worked). Straight Time for all hours worked over 40 hours/wk as bonus incentive.

(Doc. 30-1, p. 4).

hourly basis." (Doc. 11, p. 2). Southern Synergy stated that it "did not know that its pay practice violated the FLSA and did not recklessly disregard its obligations or Cornelison's rights under the FLSA," that it "believed in good faith that Cornelison was exempt from the FLSA's overtime provision," and that it "had a good faith belief that its failure to pay the overtime premium was not in violation of the FLSA." (Doc. 11, pp. 2–3). Still, the company "stipulate[d] to a three-year period for the recovery by Cornelison of unpaid wages measured from the filing of Cornelison's Complaint." (Doc. 11, p. 2).

In its verified answer, Southern Synergy admitted that it owes Mr. Cornelison "$30,826.63 in unpaid wages"; stated that it delivered a check in that amount to Mr. Cornelison on September 9, 2020; and indicated that it also "made an unconditional payment by check dated September 9, 2020 in the amount of $1,387.20, which represents 4.5 % of the unpaid wages, to compensate Cornelison

for not having use of the unpaid wages." (Doc. 11, p. 3; Doc. 11-3).[3]  Southern

Synergy acknowledged that the Court had the ability under the FLSA to award

liquidated damages but argued that the Court had the discretion to minimize or

eliminate liquidated damages "'if the employer shows to the satisfaction of the court

that the act or omission of failing to pay appropriate wages was in good faith and

that the employer had a good faith belief that the act or omission was not in violation

of the FLSA,' *Morgan v. Family Dollar Stores, Inc*., 551 F.3d 1233, 1282 (11th Cir.

2008) (citing 29 U.S.C. § 260)." (Doc. 11, p. 4).  Southern Synergy argued that its

4.5% interest payment to Mr. Cornelison supplied grounds for the Court to deny

Mr. Cornelison's request for liquidated damages. (Doc. 11, p. 4).  According to

Southern Synergy,

---

[3] Mr. Cornelison disputes the amount of unpaid overtime wages that Southern Synergy calculated, and he disputes the amount of withholding that Southern Synergy made from the check for unpaid overtime wages. (Doc. 15, pp. 1-2). In its opposition to Mr. Cornelison's motion for conditional class certification and court-approved notice, Southern Synergy states:  "Cornelison has not challenged and does not challenge Southern Synergy's calculation of the unpaid overtime premium." (Doc. 30, p. 4). Southern Synergy is incorrect.

Southern Synergy apparently realized as much because it filed a supplemental report concerning its wage calculations. In the report, the company acknowledged that it undercounted unpaid wages for 24 employees, including Mr. Cornelison. (Doc. 32). In its report, Southern Synergy took the position that the undercount was not significant because "the bulk" of its calculation errors "falls in the week of February 26 to March 4, 2018. Wages for this workweek would not be recoverable in an FLSA action as the workweek is beyond the FLSA's maximum three-year recovery period." (Doc. 32, p. 2). But in its verified answer, Southern Synergy indicated that the relevant three-year period in this case is "the three-year period immediately preceding the filing of the [August 2020] Complaint" in this matter. (Doc. 11, p. 3). That three-year period commenced in August 2017 and captured the 2018 overtime hours that Southern Synergy omitted from its initial calculations. Southern Synergy reports that it failed to account for a total of $8,057.31 in overtime wages for the 24 employees in its initial overtime calculation. (Doc. 32, p. 3).

The net result of this Answer and proposal with respect to liquidated damages would be the entry of judgment in Cornelison's favor on his claim for unpaid wages in the amount of $0, no award of liquidated damages, and the award of costs, including a reasonable attorneys' fee, in an amount to be determined by the Court, to which judgment Southern Synergy stipulates. This Answer offers complete relief to Cornelison.

(Doc. 11, p. 4).

Southern Synergy argued that, because "all putative plaintiffs" had "been paid all wages due," the record did not support Mr. Cornelison's effort to proceed with a collective action.   (Doc. 30, p. 1).  And Southern Synergy argued that because Mr. Cornelison could not proceed with a collective action, he could not ask the Court to toll the statute of limitations for other Southern Synergy employees.  (Doc. 38).

The Court found that Southern Synergy's communication with its employees and its attempt to preempt an award of liquidated damages to potential opt-in plaintiffs was improper.  The Court explained:

Congress enacted the FLSA in 1938 with the goal of 'protect[ing] all covered workers from substandard wages and oppressive working hours.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (quoting *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 739 (1981)); *see also Barrentine*, 450 U.S. at 737, 739 (explaining that Congress designed the FLSA "to provide minimum substantive guarantees to individual workers" and "to ensure that *each* employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from 'the evil of 'overwork' as well as 'underpay.'") (emphasis in *Barrentine*).  In doing so, Congress endeavored more broadly to protect the public interest by preventing employment practices that "endanger[] the national health and well-being and the free flow of goods in interstate commerce."

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945). Congress explained that it adopted the FLSA "to correct and as rapidly as practicable to eliminate" from industries engaged in commerce "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," "without substantially curtailing employment or earning power." 29 U.S.C. § 202(a) & (b).

To accomplish its purposes, Congress enacted an hourly minimum wage and set a 40-hour workweek. 29 U.S.C. §§ 206(a)(1), 207(a). "Among other requirements, the FLSA obligates employers to compensate employees for hours in excess of 40 per week at a rate of 1 1/2 times the employees' regular wages." *Christopher*, 567 U.S. at 147. The Supreme Court has directed that "[t]he broad remedial goal" of the FLSA "should be enforced to the fullest extent of its terms." *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989).

Some categories of employees—bona fide executives and professionals, teachers, and outside salesmen, for example—are exempt from the requirements of the FLSA. 29 U.S.C. § 213. In the case of outside salesmen, executives, and professionals, the exemption is premised in part "on the belief that exempt employees 'typically earned salaries well above the minimum wage' and enjoyed other benefits that 'se[t] them apart from the nonexempt workers entitled to overtime pay.' Preamble 22124." *Christopher*, 567 U.S. at 166.[4] In *Christopher*, each drug company detailer who sought overtime wages "earned an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs in his assigned sales territory[.]" *Christopher*, 567 U.S. at 166. The Supreme Court remarked that the detailers were "hardly the kind of employees that the FLSA was intended to protect." *Christopher*, 567 U.S. at 166. Still, the Supreme Court has instructed courts to construe the exemptions to the FLSA narrowly and limit their application "to those [employees] plainly and unmistakably within their terms and spirit." *Arnold v. Ben*

---

[4] *See generally Rafferty v. Denny's, Inc.*, No. 20-13715, --- F.4th ---, 2021 WL 4189698 at *3 (11th Cir. Sept. 15, 2021) (explaining that Congress "sought 'to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage.'") (quoting *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1207 (11th Cir. 2015)).

*Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  "[T]he general rule [is] that the application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974).

If an employee proves that his employer violated the FLSA, the employer must remit to the employee all unpaid wages or compensation, liquidated damages in an amount equal to the unpaid wages, reasonable attorney fees, and costs.  29 U.S.C. § 216(b). "FLSA provisions are mandatory; the 'provisions are not subject to negotiation or bargaining between employer and employee.'"  *Silva v. Miller*, 307 Fed. Appx. 349, 351 (11th Cir. 2009) (quoting *Lynn's Food Stores, Inc. v. U.S. ex. rel. U.S. Dep't of Labor*, 679 F.2d 1350, 1352 (11th Cir. 1982)); *see also Brooklyn Sav. Bank*, 324 U.S. at 707.  "Any amount due that is not in dispute must be paid unequivocally; employers may not extract valuable concessions in return for payment that is indisputably owed under the FLSA."  *Hogan v. Allstate Beverage Co., Inc.*, 821 F.Supp.2d 1274, 1282 (M.D. Ala. 2011).[5]

An employee may bring an FLSA action against his employer "for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  "This section explicitly authorizes employees to bring minimum wage, overtime, and anti-retaliation claims for themselves and people like them."  *Calderone v. Scott*, 838 F.3d 1101, 1104-05 (11th Cir. 2016).  "A collective action allows [FLSA] plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.  The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged" policy or practice that violates that FLSA's hourly wage provisions. *Hoffmann–La Roche*, 493 U.S. at 170.

"No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is

---

[5] Parties may settle an FLSA claim for unpaid wages if there is a bona fide dispute relating to a material issue concerning the claim.  To compromise a claim for unpaid wages, the parties must "present to the district court a proposed settlement, [and] the district court may enter a stipulated judgment after scrutinizing the settlement for fairness."  *Lynn's Food*, 679 F.2d at 1353; *see also Hogan*, 821 F.Supp.2d at 1281–82.  "If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute," then a court may approve a settlement.  *Lynn's Food*, 679 F.2d at 1354.

filed in the court in which such action is brought."  29 U.S.C. § 216(b).
In other words, "an FLSA collective action is 'opt-in.'"  *Calderone*, 838
F.3d at 1104.

> To maintain an opt-in collective action under § 216(b),
> plaintiffs must demonstrate that they are "similarly
> situated."  *Id.*  At the certification stage, this requirement
> is "not particularly stringent":  opt-in plaintiffs "need
> show only that their positions are similar, not identical, to
> the positions held by the putative class members."

*Calderone*, 838 F.3d at 1104 (quoting *Hipp v. Liberty Nat'l Life Ins.
Co.*, 252 F.3d 1208, 1214, 1217 (11th Cir. 2001) (*per curiam*)
(quotation omitted)).[6]

Employees eligible to participate in a collective action because they are
situated similarly to the named plaintiff must receive "accurate and
timely notice concerning the pendency of the collective action, so that
they can make informed decisions about whether to participate."
*Hoffmann–La Roche*, 493 U.S. at 170.

> Section 216(b)'s affirmative permission for employees to
> proceed on behalf of those similarly situated must grant
> the court the requisite procedural authority to manage the
> process of joining multiple parties in a manner that is
> orderly, sensible, and not otherwise contrary to statutory
> commands or the provisions of the Federal Rules of Civil

---

[6] "In 1938, Congress gave employees and their 'representatives' the right to bring actions to
recover amounts due under the FLSA. No written consent requirement of joinder was specified by
the statute."  *Hoffmann–La Roche*, 493 U.S. at 173.  In 1947, in response "to excessive litigation
spawned by plaintiffs lacking a personal interest in the outcome" of an FLSA action, Congress
eliminated "the representative action by plaintiffs not themselves possessing claims" and added
"the requirement that an employee file a written consent" to participate in a collective action.
*Hoffmann–La Roche*, 493 U.S. at 173 (citing 93 Cong. Rec. 538, 2182 (1947) (remarks of Sen.
Donnell)).  "The relevant amendment was for the purpose of limiting private FLSA plaintiffs to
employees who asserted claims in their own right and freeing employers of the burden of
representative actions."  *Hoffmann–La Roche*, 493 U.S. at 173 (citing Portal–to–Portal Act of
1947, ch. 52, §§ 5(a), 6, 7, 61 Stat. 87–88).  Today, "plaintiffs not themselves possessing claims"
could not maintain a representative action because they could not establish the first element of the
"constitutional minimum of standing," injury in fact.  *Lujan v. Defenders of Wildlife*, 504 U.S.
555, 560 (1992).

> Procedure. See Fed. Rule Civ. Proc. 83. It follows that, once an [FLSA] action is filed, the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way.

> *Hoffmann–La Roche*, 493 U.S. at 170-71.  Notice is important not only to prevent violations of federal wage requirements but also to preempt misuse of collective actions by attorneys and parties.  *Hoffmann–La Roche*, 493 U.S. at 171.  Notice ensures that potential plaintiffs receive uniform, accurate information about their potential wage claim.  "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative." *Hoffmann–La Roche*, 493 U.S. at 172.  A district court has discretion to decide when to begin its involvement in the notice process, and a court, in evaluating proposed language for notice to similarly situated employees, "must take care to avoid even the appearance of judicial endorsement of the merits of the action." *Hoffmann–La Roche*, 493 U.S. at 174.

(Doc. 40, pp. 3–8).  The Court approved Mr. Cornelison's proposed notice to similarly situated Southern Synergy employees.  (Doc. 44).

On July 28, 2022, the Court held a telephone conference in response to Mr. Cornelison's concern about the possibility that improper communication from Southern Synergy resulted in a complete absence of opt-in plaintiffs.  (Doc. 52). The Court authorized Mr. Cornelison to take the deposition of Southern Synergy's corporate representative to ascertain whether Southern Synergy improperly communicated with putative plaintiffs and ordered the parties to file a joint status report updating the Court on their findings. (Doc. 54).

Following this telephone conference, Southern Synergy filed its second motion to moot the Court's conditional certification.  (Doc. 55).  Mr. Cornelison

filed a status report in which he stated that "[t]he deposition testimony and exhibits reveal[ed] that, just as Plaintiff suspected, Defendant Southern Synergy continued to communicate misinformation related to the litigation, and the FLSA, to the putative collective action members." (Doc. 57, p. 3).

Mr. Cornelison deposed Jennifer Marquette, a senior bookkeeper at Southern Synergy, to determine if Southern Synergy improperly communicated with the putative plaintiffs. (Doc. 55-1, p. 4, tp. 10). According to Ms. Marquette, in April of 2022, approximately one month before the putative plaintiffs received the court approved notice of the lawsuit, Southern Synergy held a mandatory meeting in which company representatives discussed the upcoming notice with putative plaintiffs. (Doc. 55-1, p. 8, tpp. 26–27). Ms. Marquette prepared a summary of points related to the upcoming notice and lawsuit, and Southern Synergy's owner, Craig Thomas, discussed those points during the meeting. (Doc. 55-1, p. 5, tp. 13; p. 8, tpp. 26–27). The summary of points Ms. Marquette prepared, titled "Notes on Lawsuit," stated:

- On August 11, 2020, Steve Cornelison filed a lawsuit against SSI pursuant to the FLSA for unpaid overtime for the period of 8/11/2017 through 11/9/2020 and for liquidated damages.

- Liquidated damages compensate an hourly employee for damages incurred because of the employee's lack of access to the overtime wages when earned.

- Liquidated damages may be awarded up to the amount of unpaid overtime wages earned.

- This lawsuit has been filed as a collective action. Which means that any past or present employee can join Steve Cornelison in this lawsuit.

- SSI has issued checks "halftime" of any unpaid overtime wages that SSI owed an employee and an interest payment of 4.5%. If an employee decides to join the suit, the 4.5% payment will be subtracted from the liquidated damages that may be granted to an employee.

- Each employee that was impacted by the unpaid overtime wages will be receiving a letter in the mail allowing a past or present employee to join the collective action. With this letter an employee will also receive all past paystubs and timesheets for the time period stated in the suit.

- Each employee has the option to join the lawsuit or not. If an employee chooses to join the lawsuit, then they are bound by that judgement and are agreeing that Steve Cornelison can make settlement decision [*sic*] on their behalf. Also, the employee may be required to provide information and documentation, appear for a deposition and testify in court about their employment with SSI.

- There will be no discrimination or termination against any current employee that wishes to join the lawsuit.

(Doc. 55-2, p. 9). The meeting was mandatory for employees of Southern Synergy's Alabama office. (Doc. 55-1, p. 10, tpp. 33–34). Southern Synergy did not record the meeting, (Doc. 55-1, p. 10, tp. 33), and Ms. Marquette does not recall what information Mr. Thomas provided about liquidated damages at the meeting, (Doc. 55-1, p. 9, tp. 30).

Mr. Thomas told the putative plaintiffs at the meeting to direct questions about

the lawsuit to Ms. Marquette.   (Doc. 55-1, p. 13, tp. 45).   Four putative plaintiffs—Phillip Black, Barry Campbell, Carlos DaLuz, and Randall Kiper—contacted Ms. Marquette with questions after receiving the court-authorized notice.  (Doc. 55-1, pp. 10–11, tpp. 36–39; Doc. 55-2).[7]  Mr. Black, Mr. Campbell, and Mr. DaLuz asked Ms. Marquette why the amount of unpaid wages stated in the notice was different from the amount Southern Synergy paid them.  (Doc. 55-1, p. 11, tpp. 37–39).   Ms. Marquette informed Mr. Black, Mr. Campbell, and Mr. DaLuz that the amount in the notice included taxes.   (Doc. 55-1, p. 11, tpp. 37–39).  Mr. Kipker, "wanted to know what he needed to do if he chose to join the suit," and he asked about liquidated damages.   (Doc. 55-1, p. 11, tp. 39). Ms. Marquette informed Mr. Kipker that "he needed to read his notice, and there was an opt-in page on the back of it," and told him that she "did not know what liquidated damages were, and there was no way for [her] to be able to tell him how much" he would recover.  (Doc. 55-1, p. 11, tpp. 39–40).

Based on Southern Synergy's actions, Mr. Cornelison asked the Court to grant summary judgment in his favor and in favor of the putative plaintiffs.  (Doc. 61). Mr. Cornelison also requested sanctions against Southern Synergy for improperly communicating with putative plaintiffs.  (Doc. 61).

---

[7] Mr. Campbell contacted Ms. Marquette about his question by phone because he no longer worked at Southern Synergy; the other three putative plaintiffs visited Ms. Marquette in her office. (Doc. 55-1, p. 11, tpp. 37–39).

On June 9, 2023, the Court issued an order permitting Mr. Cornelison to send a corrective notice to the putative plaintiffs in light of Southern Synergy's actions at Southern Synergy's expense. The Court explained:

> When the Court conditionally approved this collective action and began overseeing the notice process, the Court noted that overseeing notice was "particularly important in this case" because of Southern Synergy's preemptive litigation strategy. (Doc. 40, p. 22). On September 9, 2020, approximately one month after Mr. Cornelison filed this suit, Southern Synergy sent a letter to its hourly wage employees acknowledging that it owed them overtime compensation for "the last 3 years (the max statute of limitation under FLSA)" and stating that the company was "now paying for the 'half time' that [the employees] did not receive." (Doc. 55-2, p. 7). Southern Synergy also issued "a separate check for interest on the 'unpaid wages' in the amount of 4.5% of the 'unpaid wages.'" (Doc. 55-2, p. 7). On March 24, 2021, Southern Synergy discovered that it miscalculated the amounts paid to some of the hourly wage employees in September of 2020, so it still owed overtime wages to several of them. Southern Synergy issued a second payment to the affected putative plaintiffs along with a 4.5 percent interest payment on the unpaid wages. (Doc. 55-1, p. 8, tp. 25); (Doc. 55-2, p. 8); (Doc. 40, p. 22).
>
> The Court previously found that Southern Synergy's payment of overtime unpaid wages and interest to putative plaintiffs was a targeted effort to preempt a collective action and avoid having to pay liquidated damages and attorney fees. (Doc. 40, p. 22 n.11). The Court stated that "Southern Synergy's September 9, 2020 letter to its hourly employees is precisely the type of communication that the Supreme Court criticized in Hoffmann-Laroche" because it omitted "information about Mr. Cornelison's lawsuit, the fact that Mr. Cornelison had pleaded his action as a collective action so that the employees could join it, and the fact that liquidated damages might be available to the employees if they joined the action," (Doc. 40, pp. 1–2, 22). Despite the Court's admonition, and in the wake of Mr. Cornelison's accusations of improper communications with the putative plaintiffs, Southern Synergy and its lawyers moved full steam ahead and insisted that the Court do away with the collective action.

. . .

While defendants generally are not forbidden from communicating with putative plaintiffs about collective actions, such communications must not be "factually inaccurate, unbalanced, or misleading." *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1216–27 (S.D. Ala. 2008). Improper communications with putative plaintiffs "include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1379 (S.D. Ga. 2009) (internal quotations and citation omitted). "[U]nsupervised, unilateral communications with [] potential plaintiffs can sabotage the goal of the FLSA's informed consent requirement by planting the slightest seed of doubt or worry through the one-sided, unrebutted presentation of 'facts.' Because the damage from misstatements could well be irreparable, the district court must be able to exercise its discretion to attempt to correct the effects of such actions." *Billingsley*, 560 Fed. Appx. at 924; *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1203 (11th Cir. 1985) (same); *Valente v. Int'l Follies, Inc.*, 2016 WL 7494258, at *2 (N.D. Ga. Apr. 27, 2016) (same). Where "the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive." *Kleiner*, 751 F.2d at 1202; *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1380 (S.D. Ga. 2009).

Southern Synergy argues that the information shared at the meeting was "consistent both with the FLSA and the court-approved notice" and that "[t]o the extent a notice recipient misunderstood anything said at the meeting, the court's approved notice that was received a few weeks later . . . certainly clarified the recipients' rights." (Doc. 63-1, p. 6). The Court disagrees. The mandatory meeting, held to "address rumors concerning Cornelison's lawsuit against the company and the court-approved notice," (Doc. 63-1, pp. 3–4), is part of Southern Synergy's continuing effort to undermine, or at least cabin, the collective action process by controlling the information conveyed to its employees about the lawsuit before putative plaintiffs hear from the Court.

Based on the information Southern Synergy provided, putative plaintiffs reasonably may have been concerned that if they joined the lawsuit, and a liquidated damages award was lower than the interest Southern Synergy previously paid them, they would owe Southern Synergy money. Southern Synergy's "one-sided, unrebutted presentation of facts" could have planted a "seed of doubt or worry" in the putative plaintiffs' heads and tainted the collective action process. *Billingsley*, 560 Fed. Appx. at 924. In addition, telling the putative plaintiffs to direct questions about the lawsuit to Ms. Marquette created a risk of misinformation about the action. (Doc. 55-1, p. 5, tp. 16; p. 8, tp. 28). When Mr. Kipker asked Ms. Marquette about liquidated damages, Ms. Marquette could not answer that question. (Doc. 55-1, p.11, tp. 39). Had Mr. Kipker contacted plaintiff's counsel or another lawyer, he may have learned that an award of liquidated damages in his favor could be significant, (Doc. 61-2, p. 2).

During a hearing with the parties, Mr. Cornelison's counsel stated that none of the putative plaintiffs contacted his office with questions or concerns about the lawsuit after receiving the court-approved notice. (Minute Entry, July 28, 2022). By directing the putative plaintiffs' questions about the lawsuit to Ms. Marquette, Southern Synergy continued to control the information disseminated about the lawsuit. Southern Synergy's message to putative plaintiffs that Mr. Cornelison could make settlement decisions on their behalf omitted important information about the required court approval for an FLSA settlement and implied to putative plaintiffs that their interests might not be adequately protected if they joined the lawsuit. Providing the putative plaintiffs with incomplete information about their settlement rights could have dissuaded them from joining the lawsuit.

Considering the totality of Southern Synergy's actions since this lawsuit began, the information shared at the April 2022 meeting, particularly information about liquidated damages and settlement rights, was enough to mislead the putative plaintiffs and discourage them from joining the collective action. The putative plaintiffs have the right to decline to join this lawsuit, but that right must be exercised without undue influence by Southern Synergy.

(Doc. 68, pp. 3–4, 7–10). The Court denied Southern Synergy's motion to moot the

Court's conditional certification. (Doc. 68, p. 10). Having authorized Mr. Cornelison to send a corrective notice to all putative plaintiffs, the Court denied Mr. Cornelison's motions for summary judgment and sanctions as moot. (Doc. 68, p. 10). The Court stated that "Southern Synergy's actions have delayed this proceeding and prejudiced Mr. Cornelison" and that it would later "consider appropriate sanctions for that delay." (Doc. 68, p. 10).

On July 28, 2023, the Court held a telephone conference in response to Mr. Cornelison's request for a conference to discuss the status of the second notice sent to the putative plaintiffs. (Minute Entry, July 28, 2023). During the telephone conference, Mr. Cornelison represented that none of the putative collective action members reached out to inquire about this action or consented to join this action. Mr. Cornelison argues that Southern Synergy's actions dissuaded the putative plaintiffs from opting-in and asks the Court to sanction Southern Synergy in the form of "liquidated damages that it withheld from the putative collective action members, as well as the reasonable attorney's fees, expenses, and costs associated with the continued litigation of this case." (Doc. 74, p. 11).

## II.

The Court first considers Mr. Cornelison's motion for sanctions. The Court agrees that assessment of reasonable attorney fees, expenses, and costs associated with the litigation of this case is a proper sanction for Southern Synergy's actions.

This is not a complicated case; Southern Synergy conceded in its verified answer that its pay practices violated the FLSA's overtime provision. If Southern Synergy had allowed this case to unfold without communicating improperly with its employees about the case, this case would have been resolved a long time ago. Southern Synergy's actions have generated motions and hearings to address the company's efforts to discourage the putative plaintiffs from joining this action. Southern Synergy should bear the costs associated with this delay.

An award of liquidated damages to the putative plaintiffs is not an appropriate sanction in this particular case. In permitting Mr. Cornelison to send corrective notices, the Court explained that "[t]he putative plaintiffs have the right to decline to join this lawsuit, but that right must be exercised without undue influence by Southern Synergy." (Doc. 68, p. 10). The corrective notices were meant to clarify Southern Synergy's misleading statements and allow the putative plaintiffs to make informed decisions about whether to participate in this action. *Hoffmann-La Roche*, 493 U.S. at 170. Until a putative plaintiff affirmatively consents to join a collective action, "no person will be bound by or may benefit from judgment." *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1249 (11th Cir. 2003) (quoting *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975)). While the putative plaintiffs could have recovered liquidated damages had they

opted-in, these individuals may have good reasons for choosing not to join this action, and the Court will not second-guess those reasons.

## III.

Because no putative plaintiff has joined this action, the Court must resolve only Mr. Cornelison's FLSA claim. Under Federal Rule of Civil Procedure 56(f), "[a]fter giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). Mr. Cornelison previously filed a motion for summary judgment, and that motion was fully briefed. (Docs. 61, 65, 66). Southern Synergy has conceded that it violated the FLSA by failing to properly pay Mr. Cornelison for overtime hours that he worked. Therefore, the Court will enter judgment in Mr. Cornelison's favor for his unpaid wages and for liquidated damages.

Mr. Cornelison contends that he is entitled to unpaid overtime wages of $31,157.38, but he has not explained how he calculated this amount. (Doc. 61-2, p. 2). In its verified answer, Southern Synergy admitted that it owes Mr. Cornelison "$30,826.63 in unpaid wages" based on Mr. Cornelison's timesheets and paystubs. (Doc. 11, p. 3; *see also* Docs. 11-1, 11-2). Southern Synergy later acknowledged that its initial calculation was incorrect and that the company owes Mr. Cornelison an additional $406.50 in overtime pay. (Doc. 32, p. 2). This $406.50 added to the

$30,826.63 Southern Synergy initially calculated produces a total of $31,233.13 in unpaid overtime compensation. Thus, viewed in the light most favorable to Mr. Cornelison, the Court finds that Mr. Cornelison is entitled to $31,233.13 in unpaid overtime compensation.

Under the FLSA, liquidated damages are mandatory when an employer violates the FLSA's minimum wage and overtime compensation provisions, 29 U.S.C. § 216(b), but courts have discretion to deny liquidated damages if an employer in an FLSA action shows that "the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [Act]." *Gelber v. Akal Sec., Inc.*, 14 F.4th 1279, 1288 (11th Cir. 2021) (quoting 29 U.S.C. § 260). The employer has the burden of "establishing both the subjective and objective components of that good faith defense against liquidated damages." *Gelber*, 14 F.4th at 1288 (quoting *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008)).

Southern Synergy acknowledges that Mr. Cornelison is entitled to liquidated damages but argues that the Court should exercise its discretion and deny liquidated damages based on the interest payment Southern Synergy made to Mr. Cornelison. (Doc. 11, p. 4; Doc. 65, pp. 2–4) Southern Synergy correctly points out that in an FLSA action, a plaintiff may not recover both liquidated damages and prejudgment interest. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 715 (1945) (explaining that an

employee may not to recover interest on unpaid wages and liquidated damages under the FLSA because doing so would produce a double recovery); *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir. 1987) (same).   Southern Synergy acknowledges that Mr. Cornelison has not cashed the checks the company issued for his unpaid overtime wages and interest on those wages.  (Doc. 65, pp. 2–3).  Had Mr. Cornelison accepted the interest payment, the Court would have to credit the interest payment against a liquidated damages award, but this would not preclude Mr. Cornelison from recovering liquidated damages; he could recover the difference between his unpaid wages and the interest payment.  *See Joiner*, 814 F.2d at 1539. Because Mr. Cornelison did not accept Southern Synergy's interest payment, the payment does not impact Mr. Cornelison's request for liquidated damages.

In its verified answer, Southern Synergy asserts that it "believed in good faith that Cornelison was exempt from the FLSA's overtime provision; its act of failing to pay appropriate wages was in good faith and Southern Synergy had a good faith belief that its failure to pay the overtime premium was not in violation of the FLSA." (Doc. 11, pp. 2–3).  Southern Synergy did not argue this good-faith defense in response to Mr. Cornelison's motion for summary judgment, and Southern Synergy has not presented evidence or otherwise demonstrated that it acted in good faith. (*See* Doc. 65).  The company's conduct in this litigation is not consistent with the company's assertion of good faith behavior in its failure to pay Mr. Cornelison and

similarly situated employees overtime wages under the FLSA.[8]  Accordingly, the Court finds that Mr. Cornelison is entitled to $31,233.13 in liquidated damages.

Pursuant to § 216(b), a prevailing FLSA plaintiff may recover attorney's fees. 29 U.S.C. § 216(b) (stating that, "in addition to any judgment awarded to" an FLSA plaintiff, § 216(b) "allow[s] a reasonable attorney's fee to be paid by the defendant, and costs of the action").  The Court finds that Mr. Cornelison is entitled to reasonable attorneys' fees and costs.

## IV.

Based on the forgoing discussion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court enters judgment in favor of Mr. Cornelison on his FLSA claim against Southern Synergy.  Within 14 days of this order, Mr. Cornelison should submit an affidavit setting out his attorney fees and costs; Southern Synergy may respond within seven days.  The Court will issue a separate final judgment consistent with this opinion after the Court assesses attorney fees.

**DONE** and **ORDERED** this May 31, 2024.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[8] By attempting to resolve the claims of the putative members directly, Southern Synergy sought not only to avoid payment of liquidated damages equal to the amounts of unpaid wages but also to avoid the FLSA court-approval process set forth in *Lynn's Foods*.  *See supra* note 5.